## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTER-MARKETING GROUP USA, INC., Individually and On Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>v.<br><br>CENTURYLINK, INC., GLEN F. POST, III, R. STEWART EWING, JR., and DAVID D. COLE,<br><br>                              Defendants. | Case No.<br><br><u>CLASS ACTION</u><br><br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Inter-Marketing Group USA, Inc. ("Plaintiff") individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by CenturyLink, Inc. ("CenturyLink" or the "Company"), Company press releases, earning calls, analyst reports and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired CenturyLink's 7.60% Senior Notes, Series P, due 2039 ("7.60% Senior Notes" or "Notes") during the period March 1, 2013 through June 19, 2017, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  These claims are asserted against CenturyLink and certain of its officers and/or directors who made materially false or misleading statements during the Class Period in press releases and filings with the SEC.

2.      CenturyLink provides various communications services to residential, business, wholesale and governmental customers in the United States. It operates through two segments: Business and Consumer. The Company offers broadband, Ethernet, colocation, video entertainment and satellite digital television services.

3.      Throughout the Class Period, defendants made materially false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operations and compliance policies.  Specifically, defendants failed to disclose that:

1

(a)    CenturyLink's policies allowed its employees to add services or lines to accounts without customer permission, resulting in millions of dollars in unauthorized charges to CenturyLink customers;

(b)    CenturyLink's illicit practices were designed to allow CenturyLink to gain an advantage over its competitors and to increase profits;

(c)    CenturyLink's illicit conduct was likely to subject it to heightened regulatory scrutiny; and

(d)    The Company's revenues were the product of illicit conduct and were unsustainable.

4.    As a result of the foregoing, defendants' statements during the Class Period were false and misleading and/or lacked a reasonable basis.

5.    On June 16, 2017, *Bloomberg* published an article entitled "CenturyLink Is Accused of Running a Wells Fargo-Like Scheme." The article reported on a lawsuit, recently filed in Arizona state superior court by former CenturyLink employee Heidi Heiser, alleging that Heiser "was fired for blowing the whistle on the telecommunications company's high-pressure sales culture that left customers paying millions of dollars for accounts they didn't request." The *Bloomberg* article stated that Heiser "was fired days after notifying Chief Executive Officer Glen Post of the alleged scheme during a companywide question-and-answer session held on an internal message board."

6.    Then, on June 19, 2017, *Bloomberg* reported that a consumer complaint had been filed against CenturyLink based on the whistleblower complaint alleging fraud, unfair competition and unjust enrichment.  The *Bloomberg* article explained that the class action complaint was seeking damages as high as $12 billion.

7.      As a result of this news, the price of CenturyLink's 7.60% Senior Notes dropped to $92.61 on June 19, 2017 from its close of $98.43 on the previous trading day, a $5.82 (or 6%) drop, on heavy trading volume.

8.      As a result of defendants' wrongful acts and omissions, plaintiff and the Class (as defined below) purchased CenturyLink Notes at artificially inflated prices and suffered significant losses and were damaged thereby.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

10.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. 78aa) and 28 U.S.C. §1331.

11.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

12.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, and interstate telephone communications.

## THE PARTIES

13.      Plaintiff Inter-Marketing Group USA, Inc., as set forth in the accompanying certification, purchased CenturyLink's 7.60% Senior Notes during the Class Period and was damaged thereby.

14.     Defendant CenturyLink is a Louisiana corporation headquartered at 100 CenturyLink Drive, Monroe, Louisiana 71203. CenturyLink's common stock trades on the NYSE under the symbol "CTL."

15.     Defendant Glen F. Post, III ("Post") founded the Company and is, and at all relevant times was, Chief Executive Officer ("CEO"), President and a director of CenturyLink.

16.     Defendant R. Stewart Ewing, Jr. ("Ewing") is, and at all relevant times was, Chief Financial Officer ("CFO") and Executive Vice President of CenturyLink.

17.     Defendant David D. Cole ("Cole") is, and at all relevant times was, Executive Vice President and Controller of CenturyLink.

18.     Defendants Post, Ewing, and Cole are collectively referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, false statements that artificially inflated the prices of CenturyLink securities, including the Notes, during the Class Period.

19.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of CenturyLink's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being

made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

20. Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about CenturyLink. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of CenturyLink securities was a success, as it: (i) deceived the investing public regarding CenturyLink's prospects and business; (ii) artificially inflated the prices of CenturyLink securities; and (iii) caused plaintiff and other members of the Class to purchase CenturyLink securities at artificially inflated prices.

21. During the Class Period, defendants had the motive and opportunity to commit the alleged fraud. Defendants also had actual knowledge of the misleading statements they made and/or acted in reckless disregard of the truth at the time. In doing so, defendants participated in a scheme to defraud and committed acts and practices and participated in a course of business that operated as a fraud or deceit on purchasers of CenturyLink securities during the Class Period.

## FACTUAL BACKGROUND

22. CenturyLink provides various communications services to residential, business, wholesale and governmental customers in the United States. It operates through two segments: Business and Consumer. The Company offers broadband, Ethernet, colocation, video entertainment and satellite digital television services. The Company has over 5 million subscribers in a 37-state service area.

23. The CenturyLink reporting segment focused on its residential customers was known within the Company as the Consumer segment. The products and services the Company offered to these customers included broadband, wireless and video services (including its Prism TV services) and legacy services such as local and long-distance telephone lines. Throughout the

Class Period, the Company's Consumer segment generated approximately one-third of its revenues.

24.     CenturyLink characterized its sales approach to its residential customers as emphasizing "customer-oriented sales, marketing and service." The Company marketed its products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties. Key to the Company's business strategy was "bundling" its products, whereby customers received a comprehensive set of products and services purportedly to "enhance customer loyalty." As a result, CenturyLink's customer service and the actions of its salesforce – and in particular these employees' compliance with applicable laws and regulations and their treatment of consumers – were critical to the Company's success.

25.     However, unbeknownst to the Company's investors or the market, behind the scenes CenturyLink fostered a corporate sales culture that provided financial incentives to employees to charge customers for services they did not order and/or to overcharge customers for services they did order.  As a result, CenturyLink not only tolerated fraudulent billing practices, but actively encouraged them through expectations and incentive programs that rewarded CenturyLink employees, in part, based on the number of lines or services sold to customers, the upselling of services to existing customers, and the growth of the service base at CenturyLink. When the Company's customers complained about unauthorized charges, it was the practice of the Company to shift the blame for the charges onto the customer, effectively putting the onus on customers to identify and fight to correct improper charges, which often left improper charges unremediated. CenturyLink's massive overbilling of customer accounts inflated the Company's sales and revenues and exposed the Company to undisclosed legal, financial, reputational and other risks.

26.     CenturyLink essentially "doubled-down" on these unscrupulous sales tactics in November 2014. That month, the Company reorganized its salesforce and reporting segments. Whereas previously the Company had four reporting segments – Business, Wholesale and Hosting, in addition to Consumer – the Company implemented a new organizational structure with two reporting segments – Business and Consumer – reporting to Karen Puckett ("Puckett"), CenturyLink's President of Global Markets. As part of this reorganization, which continued into early 2015, the Company implemented a "more unified sales and marketing approach" under the leadership of Puckett. Members of CenturyLink's salesforce were instructed to employ a "hunter approach" to growing sales and revenues, and the Company adopted a revamped compensation structure that provided additional financial incentives for increasing the number of new accounts and cross selling Company products. While the Company disclosed these organizational changes, it portrayed them as designed to improve the "customer experience" and did not disclose that CenturyLink's salesforce was incentivized to, and in fact did, participate in illegal, unscrupulous and fraudulent billing practices that inflated the Company's sales and revenues and exposed CenturyLink to added legal, financial, reputational and other risks.

### DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

27.     On March 1, 2013, CenturyLink filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and year ended December 31, 2012 (the "2012 10-K"). For the year, the Company reported operating revenues of $18.4 billion, compared to operating revenue of $15.4 billion in the previous year, and adjusted net income of $1.66 billion, compared to adjusted net income of $1.63 billion in the previous year.

28.     With respect to the Company's sales practices, the 2012 10-K stated in relevant part:

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. We also rely on our call center personnel to promote sales of services that meet the needs of our customers. Our strategy is to enhance our communications services by offering a comprehensive bundle of services and deploying new technologies to further enhance customer loyalty.

*        *        *

Our approach to our regional markets' residential customers emphasizes customer-oriented sales, marketing and service with a local presence. We market our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties. We support our distribution with direct mail, bill inserts, newspaper advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

Our approach to our regional markets' business and  government customers includes a commitment to deliver communications products and services that meet existing and future business needs through bundles of services and integrated service offerings. Our focus is to be a comprehensive communications solution for our small office, mid-sized and select enterprise business and government customers.

Our approach to our wholesale markets' customers includes a commitment to deliver communications solutions that meet existing and future needs of national network telecommunications providers through bandwidth growth and quality of services.

Our approach to our enterprise market–network customers includes a commitment to deliver network products and services that meet existing and future customer needs by offering private line, broadband, MPLS and hosting services and well as local and long-distance services.

Our enterprise market–data hosting operations utilize a solution-based selling approach. By working directly with potential and existing clients, we are able to understand our clients' IT infrastructure and long-term goals. We also market through indirect channels, including collaborations with existing clients and technology providers, telecommunications companies and system integrators.

29.    With respect to regulations and compliance, the 2012 10-K stated in relevant part:

**Regulation**

We are subject to significant regulation by the Federal Communications Commission ("FCC"), which regulates interstate communications, and state utility commissions, which regulate intrastate communications in our local service area.

These agencies issue rules to protect consumers and promote competition; they set the rates that telecommunication companies charge each other for exchanging traffic; and they have established USF to support the provision of services to high-cost areas. In most states, local voice service, switched and special access services and interconnection services are subject to price regulation, although the extent of regulation varies by type of service and geographic region.

*       *       *

***Federal Regulation***

We are required to comply with the Communications Act of 1934, which requires us to offer services at just and reasonable rates and on non-discriminatory terms, as well as the Telecommunications Act of 1996, which amended the Communications Act of 1934 primarily to promote competition.

30.    With respect to the Company's ethics, the 2012 10-K stated in relevant part:

We have adopted written codes of conduct that serve as the code of ethics applicable to our directors, officers and employees, including our principal executive officer and senior financial officers, in accordance with applicable laws and rules promulgated by the SEC and the New York Stock Exchange. In the event that we make any changes (other than by a technical, administrative or non- substantive amendment) to, or applicable to our directors or executive officers, we intend to disclose these events on our website or in a report on Form 8-K filed with the SEC. These codes of conduct, as well as copies of our guidelines on significant governance issues and the charters of our audit committee, compensation committee, nominating and corporate governance committee and risk evaluation committee, are also available in the "Corporate Governance" section of our website at *www.centurylink.com/Pages/AboutUs/Governance/* or in print to any shareholder who requests them by sending a written request to our Corporate Secretary at CenturyLink, Inc., 100 CenturyLink Drive, Monroe, Louisiana, 71203.

31.    On February 27, 2014, CenturyLink filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and year ended December 31, 2013 (the "2013 10-K").  For the quarter, CenturyLink reported net income of $239 million, or $0.41 per diluted share, on revenue of $4.54 billion, compared to net income of $233 million, or $0.37 per diluted share, on revenue of $4.58 billion for the same period in the prior year. For 2013, CenturyLink reported a net loss of $239 million, or ($0.40) per diluted share, on

revenue of $18.01 billion, compared to net income of $777 million, or $1.25 per diluted share, on revenue of $18.38 billion for 2012.

32.    The 2013 10-K stated in relevant part:

***Products and Services***

Our products and services include local and long-distance, broadband, private line (including special access, which we market to wholesale and business customers), MLPS, data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, public access, wireless, video services and other ancillary services.

We offer our customers the ability to bundle together several products and services. For example, we offer integrated and unlimited local and long-distance services. Our customers can also bundle two or more services such as broadband, video (including DIRECTV through our strategic partnership), voice and Verizon Wireless (through our strategic partnership) services. ***We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.***

\*        \*        \*

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. We also rely on our call center personnel to promote sales of services that meet the needs of our customers. Our strategy is to enhance our communications services by offering a comprehensive bundle of services and deploying new technologies to further enhance customer loyalty.

\*        \*        \*

Our approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence. We market our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties. We support our distribution with direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

Our approach to our business and governmental customers includes a commitment to deliver communications and network products and services that meet existing and future business needs through bundles of services and integrated service offerings. Our focus is to be a comprehensive communications solution for our small office, mid-sized and select enterprise business and governmental customers. We market our products and services primarily through direct sales representatives,

inbound call centers, telemarketing and third parties. We support our distribution with direct mail, bill inserts, newspaper and television advertising, website promotions, telemarketing and third parties.

Our approach to our wholesale customers includes a commitment to deliver communications solutions that meet existing and future needs of national network telecommunications providers through bandwidth growth and quality of services.

Our data hosting operations utilize a solution-based selling approach. By working directly with potential and existing clients, we are able to understand our clients' IT infrastructure and long-term goals. We also market through indirect channels, including collaborations with existing clients and technology providers, telecommunications companies and system integrators.

[Emphasis added.]

33.     With respect to regulations and compliance, the 2013 10-K stated in part:

**Regulation**

We are subject to significant regulation by the Federal Communications Commission ("FCC"), which regulates interstate communications, and state utility commissions, which regulate intrastate communications. These agencies (i) issue rules to protect consumers and promote competition, (ii) set the rates that telecommunication companies charge each other for exchanging traffic, and (iii) have traditionally established USF to support the provision of services to high- cost areas. In most states, local voice service, switched and special access services and interconnection services are subject to price regulation, although the extent of regulation varies by type of service and geographic region. In addition, we are required to maintain licenses with the FCC and with state utility commissions. Laws and regulations in many states restrict the manner in which a licensed entity can interact with affiliates, transfer assets, issue debt and engage in other business activities, and many acquisitions and divestitures require approval by the FCC and some state commissions.

*     *     *

*Federal Regulation*

**General**

We are required to comply with the Communications Act of 1934, which requires us to offer services at just and reasonable rates and on nondiscriminatory terms, as well as the Telecommunications Act of 1996, which amended the Communications Act of 1934 primarily to promote competition.

11

34.    With respect to the Company's ethics, the 2013 10-K reiterated the information stated in the 2012 10-K:

> We have adopted written codes of conduct that serve as the code of ethics applicable to our directors, officers and employees, in accordance with applicable laws and rules promulgated by the SEC and the New York Stock Exchange.

35.    The 2013 10-K was signed by the Individual Defendants and stated that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

36.    On May 9, 2014, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 10-Q"). For the quarter, CenturyLink reported net income of $203 million, or $0.35 per diluted share, on revenue of $4.54 billion, compared to net income of $298 million, or $0.48 per diluted share, on revenue of $4.51 billion for the same period in the prior year.

37.    The Q1 2014 10-Q stated in part:

> We are an integrated communications company engaged primarily in providing an array of communications services to our residential, business, governmental and wholesale customers. Our communications services include local and long-distance, broadband, private line (including special access), Multi- Protocol Label Switching ("MPLS"), data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, public access, wireless, video and other ancillary services. ***We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.***

[Emphasis added.]

38.    The Q1 2014 10-Q was signed by and/or contained certifications of the Individual Defendants and stated that the financial information contained in the Q1 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

39.    On August 7, 2014, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30,

2014 (the "Q2 2014 10-Q"). For the quarter, CenturyLink reported net income of $193 million, or $0.34 per diluted share, on revenue of $4.54 billion, compared to net income of $269 million, or $0.44 per diluted share, on revenue of $4.53 billion for the same period in the prior year.

40.    The Q2 2014 10-Q stated in part:

We are an integrated communications company engaged primarily in providing an array of communications services to our residential, business, governmental and wholesale customers. Our communications services include local and long-distance, broadband, private line (including special access), Multi- Protocol Label Switching ("MPLS"), data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, public access, wireless, video and other ancillary services. ***We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.***

[Emphasis added.]

41.    The Q2 2014 10-Q was signed by and/or contained certifications of the Individual Defendants and stated that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

42.    On November 4, 2014, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q").  For the quarter, CenturyLink reported net income of $188 million, or $0.33 per diluted share, on revenue of $4.51 billion, compared to a net loss of $1.05 billion, or ($1.76) per diluted share, on revenue of $4.52 billion for the same period in the prior year.

43.    The Q3 2014 10-Q stated in part:

We are an integrated communications company engaged primarily in providing an array of communications services to our residential, business, governmental and wholesale customers. Our communications services include local and long-distance, broadband, private line (including special access), Multi- Protocol Label Switching ("MPLS"), data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, public access, wireless, video and other ancillary services. ***We strive to maintain our customer relationships by, among***

*other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.*

[Emphasis added.]

44.    The Q3 2014 10-Q was signed by and/or contained certifications of the Individual Defendants and stated that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

45.    On February 24, 2015, CenturyLink filed an Annual Report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and year ended December 31, 2014 (the "2014 10-K"). For the quarter, CenturyLink reported net income of $188 million, or $0.33 per diluted share, on revenue of $4.44 billion, compared to net income of $239 million, or $0.41 per diluted share, on revenue of $4.54 billion for the same period in the prior year. For 2014, CenturyLink reported net income of $772 million, or $1.36 per diluted share, on revenue of $18.03 billion, compared to a net loss of $239 million, or ($0.40) per diluted share, on revenue of $18.01 billion for 2013.

46.    The 2014 10-K stated in part:

**Products and Services**

Our products and services include local and long-distance, broadband, private line (including special access), MPLS, data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, video, wireless and other ancillary services.

We offer our customers the ability to bundle together several products and services. For example, we offer integrated and unlimited local and long-distance services. Our customers can also bundle two or more services such as broadband, video (including DIRECTV through our strategic partnership), voice and Verizon Wireless (through our strategic partnership) services. *We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.*

\*        \*        \*

**Sales and Marketing**

14

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. We also rely on our call center personnel to promote sales of services that meet the needs of our customers. Our strategy is to enhance our sales by offering a comprehensive bundle of services and deploying new technologies to further enhance customer loyalty.

\* \* \*

Our approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence. We market our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties. We support our distribution with direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

Similarly, our approach to our business, wholesale and governmental customers includes a commitment to provide comprehensive communications solutions for small office, mid-sized and select enterprise business and governmental customers. We market our products and services primarily through direct sales representatives, inbound call centers, telemarketing and third parties. We also market through indirect channels, including collaboration with existing clients and technology providers, telecommunications companies and system integrators.

[Emphasis added.]

47.    With respect to regulations and compliance, the 2014 10-K stated in relevant part:

**Regulation**

We are subject to significant regulation by the Federal Communications Commission ("FCC"), which regulates interstate communications, and state utility commissions, which regulate intrastate communications. These agencies (i) issue rules to protect consumers and promote competition, (ii) set the rates that telecommunication companies charge each other for exchanging traffic, and (iii) have traditionally established USF to support the provision of services to high-cost areas. In most states, local voice service, switched and special access services and interconnection services are subject to price regulation, although the extent of regulation varies by type of service and geographic region. In addition, we are required to maintain licenses with the FCC and with state utility commissions. Laws and regulations in many states restrict the manner in which a licensed entity can interact with affiliates, transfer assets, issue debt and engage in other business activities, and many acquisitions and divestitures require approval by the FCC and some state commissions.

\* \* \*

*Federal Regulation*

**General**

We are required to comply with the Communications Act of 1934, which requires us to offer services at just and reasonable rates and on nondiscriminatory terms, as well as the Telecommunications Act of 1996, which amended the Communications Act of 1934 primarily to promote competition.

48.     The 2014 10-K was signed by the Individual Defendants and stated that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

49.     On May 6, 2015, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"). For the quarter, CenturyLink reported net income of $192 million, or $0.34 per diluted share, on revenue of $4.45 billion, compared to net income of $203 million, or $0.35 per diluted share, on revenue of $4.54 billion for the same period in the prior year.

50.     The Q1 2015 10-Q stated in part:

We are an integrated communications company engaged primarily in providing an array of communications services to our residential, business, governmental and wholesale customers. Our communications services include local and long-distance, broadband, private line (including special access), Multi- Protocol Label Switching ("MPLS"), data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, video, wireless and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

51.     The Q1 2015 10-Q was signed by and/or contained certifications of the Individual Defendants and stated that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

52.     Then, on June 24, 2015, the Company held an analyst day during which CenturyLink's management, including defendants Post and Ewing, discussed the Company's

business and prospects. During the day's presentations, CenturyLink surprised investors and analysts by disclosing unexpected softness in the Company's sales following the sudden departure of Puckett, who had been tasked with leading the reorganization of the Company's salesforce and new sales initiatives little more than six months previously. Equity analysts following the Company expressed concern at Puckett's abrupt retirement so soon after taking the reins of a major sales initiative, as it exposed unexpected turbulence in the Company's critical sales operations and an increased reliance on growing consumer sales to offset weakness in CenturyLink's business segment.

53.    On August 6, 2015, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). For the quarter, CenturyLink reported net income of $143 million, or $0.26 per diluted share, on revenue of $4.42 billion, compared to net income of $193 million, or $0.34 per diluted share, on revenue of $4.54 billion for the same period in the prior year.

54.    The Q2 2015 10-Q stated in part:

> We are an integrated communications company engaged primarily in providing an array of communications services to our residential and business customers. Our communications services include local and long-distance, broadband, private line (including special access), Multi-Protocol Label Switching ("MPLS"), data integration, managed hosting (including cloud hosting), colocation, Ethernet, network and public access, video, wireless and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

55.    The Q2 2015 10-Q was signed by and/or contained certifications of the Individual Defendants and stated that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

56.    On November 5, 2015, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended

September 30, 2015 (the "Q3 2015 10-Q").  For the quarter, CenturyLink reported net income of $205 million, or $0.37 per diluted share, on revenue of $4.55 billion, compared to net income of $188 million, or $0.33 per diluted share, on revenue of $4.51 billion for the same period in the prior year.

57.    The Q3 2015 10-Q stated in part:

We are an integrated communications company engaged primarily in providing an array of communications services to our residential and business customers. Our communications services include local and long-distance, high- speed Internet, Multi-Protocol Label Switching ("MPLS"), private line (including special access), data integration, Ethernet, colocation, managed hosting (including cloud hosting), network, public access, video, wireless and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

58.    The Q3 2015 10-Q was signed by and/or contained certifications of the Individual Defendants and stated that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

59.    On February 25, 2016, CenturyLink filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and year ended December 31, 2015 (the "2015 10-K"). For the year, the Company reported operating revenues of $17.9 billion, compared to operating revenues of $18 billion in the previous year, and adjusted net income of $1.5 billion, compared to adjusted net income of $1.49 billion in the previous year.

60.    The 2015 10-K stated in part:

***Products and Services***

Our products and services include local and long-distance voice, high- speed Internet, MPLS, private line (including special access), data integration, Ethernet, colocation, managed hosting (including cloud hosting), network, public access, video, wireless and other ancillary services.

We offer our customers the ability to bundle together several products and services. For example, we offer integrated and unlimited local and long-distance voice

services. Our customers can also bundle two or more services such as high- speed Internet, video (including DIRECTV through our strategic partnership), voice and Verizon Wireless (through our strategic partnership) services. We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.

\*        \*        \*

## Sales and Marketing

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. We also rely on our call center personnel and a variety of channel partners to promote sales of services that meet the needs of our customers.  Our sales and marketing strategy is to enhance our sales by offering solutions tailored to the needs of our various customers and promoting our brands. Our offerings include both standalone services and bundled services designed to meet the needs of different customer segments.

\*        \*        \*

Our sales and marketing approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence. Our marketing plans include marketing our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties, including retailers, satellite television providers, door to door sales agents and digital marketing firms. We support our distribution with digital marketing, direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

Similarly, our sales and marketing approach to our business customers includes a commitment to provide comprehensive communications and IT solutions for business, wholesale and governmental customers of all sizes, ranging from small offices to select enterprise customers. Our marketing plans include marketing our products and services primarily through digital advertising, direct sales representatives, inbound call centers, telemarketing and third parties, including telecommunications agents, system integrators, value-added resellers and other telecommunications firms. We support our distribution through digital advertising, events, television advertising, website promotions and public relations.

61.    With respect to regulations and compliance, the 2015 10-K stated in part:

## Regulation

\*        \*        \*

19

We are subject to significant regulation by the Federal Communications Commission ("FCC"), which regulates interstate communications, and state utility commissions, which regulate intrastate communications. These agencies (i) issue rules to protect consumers and promote competition, (ii) set the rates that telecommunication companies charge each other for exchanging traffic, and (iii) have traditionally developed and administered support programs designed to subsidize the provision of services to high-cost rural areas.

*     *     *

### *Federal Regulation*

#### **General**

We are required to comply with the Communications Act of 1934. Among other things, this law requires our ILECs to offer various of our legacy services at just and reasonable rates and on non-discriminatory terms. The Telecommunications Act of 1996 materially amended the Communications Act of 1934, primarily to promote competition.

62.     The 2015 10-K was signed by the Individual Defendants and stated that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

63.     On May 5, 2016, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q"). For the quarter, CenturyLink reported net income of $236 million, or $0.44 per diluted share, on revenue of $4.4 billion, compared to net income of $192 million, or $0.34 per diluted share, on revenue of $4.45 billion for the same period in the prior year.

64.     The Q1 2016 10-Q stated in part:

We are an integrated communications company engaged primarily in providing an array of communications services to our residential and business customers. Our communications services include local and long-distance voice, high-speed Internet, Multi-Protocol Label Switching ("MPLS"), private line (including special access), data integration, Ethernet, colocation, managed hosting (including cloud hosting), network, public access, video, wireless and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

65.     The Q1 2016 10-Q was signed by and/or contained certifications of the Individual Defendants and stated that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

66.     On August 4, 2016, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q"). For the quarter, CenturyLink reported net income of $196 million, or $0.36 per diluted share, on revenue of $4.4 billion, compared to net income of $143 million, or $0.26 per diluted share, on revenue of $4.42 billion for the same period in the prior year.

67.     The Q2 2016 10-Q stated in part:

We are an integrated communications company engaged primarily in providing an array of services to our residential and business customers. Our communications services include local and long-distance voice, broadband, Multi- Protocol Label Switching ("MPLS"), private line (including special access), Ethernet, colocation, hosting (including cloud hosting and managed hosting), data integration, video, network, public access, Voice over Internet Protocol ("VoIP"), information technology and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

68.     The Q2 2016 10-Q was signed by and/or contained certifications of the Individual Defendants and stated that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

69.     On November 4, 2016, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q").  For the quarter, CenturyLink reported net income of $152 million, or $0.28 per diluted share, on revenue of $4.38 billion, compared to net income of $205 million, or $0.37 per diluted share, on revenue of $4.55 billion for the same period in the prior year.

70.     The Q3 2016 10-Q stated in part:

We are an integrated communications company engaged primarily in providing an array of services to our residential and business customers. Our communications services include local and long-distance voice, broadband, Multi- Protocol Label Switching ("MPLS"), private line (including special access), Ethernet, colocation, hosting (including cloud hosting and managed hosting), data integration, video, network, public access, Voice over Internet Protocol ("VoIP"), information technology and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

71.    The Q3 2016 10-Q was signed by and/or contained certifications of the Individual Defendants and stated that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

72.    On February 23, 2017, CenturyLink filed an Annual Report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and year ended December 31, 2016 (the "2016 10-K"). For the quarter, CenturyLink reported net income of $42 million, or $0.08 per diluted share, on revenue of $4.29 billion, compared to net income of $338 million, or $0.62 per diluted share, on revenue of $4.48 billion for the same period in the prior year. For 2016, CenturyLink reported net income of $626 million, or $1.16 per diluted share, on revenue of $17.47 billion, compared to net income of $878 million, or $1.58 per diluted share, on revenue of $17.9 billion for 2015.

73.    The 2016 10-K stated in part:

**Products and Services**

\*       \*       \*

Our products and services include local and long-distance voice, broadband, MPLS, private line (including special access), Ethernet, colocation, hosting (including cloud hosting and managed hosting), data integration, video, network, public access, VoIP, information technology and other ancillary services.

We offer our customers the ability to bundle together several products and services. For example, we offer integrated and unlimited local and long-distance voice services. Our customers can also bundle two or more services such as broadband, video (including DIRECTV through our strategic partnership), voice and Verizon

Wireless (through our strategic partnership) services. We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.

*        *        *

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. We also rely on our call center personnel and a variety of channel partners to promote sales of services that meet the needs of our customers. Our sales and marketing strategy is to enhance our sales by offering solutions tailored to the needs of our various customers and promoting our brands. Our offerings include both stand-alone services and bundled services designed to meet the needs of different customer segments.

*        *        *

Our sales and marketing approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence. Our marketing plans include marketing our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties, including retailers, satellite television providers, door to door sales agents and digital marketing firms. We support our distribution with digital marketing, direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

Similarly, our sales and marketing approach to our business customers includes a commitment to provide comprehensive communications and IT solutions for business, wholesale and governmental customers of all sizes, ranging from small offices to select enterprise customers. We strive to offer our business customers stable, reliable, secure and trusted solutions. Our marketing plans include marketing our products and services primarily through digital advertising, direct sales representatives, inbound call centers, telemarketing and third parties, including telecommunications agents, system integrators, value-added resellers and other telecommunications firms. We support our distribution through digital advertising, events, television advertising, website promotions and public relations.

74.    With respect to regulations and compliance, the 2016 10-K stated in part:

**Regulation**

*        *        *

We are subject to significant regulation by the FCC, which regulates interstate communications, and state utility commissions, which regulate intrastate

23

communications. These agencies (i) issue rules to protect consumers and promote competition, (ii) set the rates that telecommunication companies charge each other for exchanging traffic, and (iii) have traditionally developed and administered support programs designed to subsidize the provision of services to high-cost rural areas.

*       *       *

**Federal Regulation**

**General**

We are required to comply with the Communications Act of 1934. Among other things, this law requires our incumbent local exchange carriers ("ILECs") to offer various legacy services at just and reasonable rates and on non- discriminatory terms. The Telecommunications Act of 1996 materially amended the Communications Act of 1934, primarily to promote competition.

75.     The 2016 10-K was signed by the Individual Defendants and stated that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

76.     On May 5, 2017, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017 10-Q"). For the quarter, CenturyLink reported net income of $163 million, or $0.30 per diluted share, on revenue of $4.21 billion, compared to net income of $236 million, or $0.44 per diluted share, on revenue of $4.4 billion for the same period in the prior year.

77.     The Q1 2017 10-Q stated in part:

We are an integrated communications company engaged primarily in providing an array of services to our residential and business customers. Our communications services include local and long-distance voice, broadband, Multi- Protocol Label Switching ("MPLS"), private line (including special access), Ethernet, colocation, hosting (including cloud hosting and managed hosting), data integration, video, network, public access, Voice over Internet Protocol ("VoIP"), information technology and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

78.     The Q1 2017 10-Q was signed by and/or contained certifications of the Individual Defendants and stated that the financial information contained in the Q1 2017 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

79.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to defendants or recklessly disregarded by them. Specifically, defendants made false and misleading statements and/or failed to disclose that:

(a)     CenturyLink's policies allowed its employees to add services or lines to accounts without customer permission, resulting in millions of dollars in unauthorized charges to CenturyLink customers;

(b)     CenturyLink's illicit practices were designed to allow it to gain an advantage over its competitors and to increase profits;

(c)     CenturyLink's illicit conduct was likely to subject it to heightened regulatory scrutiny; and

(d)     The Company's revenues were the product of illicit conduct and were unsustainable.

80.     As a result of the foregoing, defendants' statements during the Class Period were false and misleading and/or lacked a reasonable basis.

81.     On June 16, 2017, *Bloomberg* published an article entitled "CenturyLink Is Accused of Running a Wells Fargo-Like Scheme." The *Bloomberg* article reported, in relevant part:

> A former CenturyLink Inc. employee claims she was fired for blowing the whistle on the telecommunications company's high-pressure sales culture that left

customers paying millions of dollars for accounts they didn't request, according to a lawsuit filed this week in Arizona state superior court.

*        *        *

The plaintiff, Heidi Heiser, worked from her home for CenturyLink as a customer service and sales agent from August 2015 to October 2016. The suit claims she was fired days after notifying Chief Executive Officer Glen Post of the alleged scheme during a companywide question-and-answer session held on an internal message board.

The complaint alleges CenturyLink "allowed persons who had a personal incentive to add services or lines to customer accounts to falsely indicate on the CenturyLink system the approval by a customer of new lines or services." This would sometimes result in charges that hadn't been authorized by customers, according to the complaint.

*        *        *

Heiser's complaint alleges that she became increasingly concerned about what she observed at CenturyLink after news of Wells Fargo & Co.'s regulatory troubles broke in September. In that case, Wells Fargo employees opened deposit and credit card accounts without customers' consent to earn incentives and meet sales goals. Without admitting wrongdoing, Wells Fargo ended up firing more than 5,000 employees and agreeing to pay $185 million in fines, in addition to compensating customers for fees related to the unauthorized accounts.

The complaint likens what Heiser said CenturyLink sales agents did to the Wells Fargo scandal and estimated the alleged unauthorized fees amounted to "many millions" of dollars. She says her concerns were bolstered by posts she had read on review websites.

A review of Yelp and Pissed Consumer finds evidence of irate customers. "They signed me up unauthorized," wrote Sierrah U. of Bend, Ore., on Yelp in February 2015. "I was talking to someone interested in signing up two weeks ago after realizing my modem was incapable I told the guy I didn't want to sign up and I would call back later if I was still interested, he got really upset hung up on me. Two weeks later I receive a bill! With a ton a fees, I don't even have internet with them!"

When a customer complained about an unauthorized charge, customer service and sales agents like Heiser were directed "to inform the complaining customer that CenturyLink's system indicated the customer had approved the service," according to the complaint, and as a result "it was really the customer's word against CenturyLink."

"CenturyLink is going to be in a world of hurt if this turns out to be true," said Roger Entner, an analyst with Recon Analytics.

26

Initially, Heiser told her direct superiors about her suspicions and was told in response to her complaints to "stay positive and not to mention her concerns again," according to the complaint. Heiser didn't report her concerns to the Federal Communications Commission or the Occupational Safety and Health Administration, a division of the U.S. Department of Labor.

Five months before she was fired, Heiser said, she experienced dropped calls with customers due to what the complaint described as a "malfunctioning system." She reported the issue repeatedly to superiors, according to the complaint. The dropped calls were allegedly cited by CenturyLink as the reason for her dismissal, which came two days after the question-and-answer session.

To lead the combined operations of CenturyLink and Level 3, activist investor Keith Meister's hedge fund, Corvex Management LLP, had sought a telecom veteran, prevailing with Storey's selection. (Meister says Corvex has built up a 5.5 percent stake in CenturyLink.) Still, Post, the current CEO, will stay on as executive chairman when Storey takes the helm.

Phone service giants such as AT&T Inc., Verizon Communications Inc., and Sprint have all settled cases in which third-party companies had been adding services to customers' phone bills without consent. These "cramming" issues typically involved $9.99 monthly charges for horoscopes and trivia games. That is different from a telephone company employee who may be looking to meet sales goals by creating false accounts or adding services to existing accounts without the subscriber's knowledge or consent.

T-Mobile U.S. Inc. was the subject of a critical report in December from a labor group called Change to Win Retail Initiatives that said the carrier put its sales staff under pressure to meet difficult sales goals. The pressure caused T- Mobile employees to force some customers to enroll in services they didn't necessarily want or authorize, according to the report. T-Mobile declined to comment on the allegation.

"When sales targets are unrealistic and employees' livelihoods are at stake, some people are going to take shortcuts," said Entner, the telecom analyst. "Companies have the responsibility to make sure the goals are realistic. You don't want to drive people to break the law."

82.     On June 19, 2017, the *Bloomberg* published a second article entitled "CenturyLink

Faces Class-Action Lawsuit Seeking Up to $12 Billion." The article stated in part:

CenturyLink Inc., sued last week by a former employee for allegedly running a sales incentive scheme and firing her for drawing attention to it, is now the subject of a class-action complaint seeking damages as high as $12 billion.

The complaint, which comes as the Monroe, La., telecommunications company is in the midst of a $34 billion merger with Level 3 Communications Inc., seeks to establish a class of consumers harmed by an alleged high-pressure sales culture. Last week's self-proclaimed whistleblower, Heidi Heiser, says such a culture left customers paying millions of dollars for accounts they didn't request.

The new lawsuit, filed in the central district of California late Sunday night, cites Heiser's suit, as well as similar accusations posted on social media and consumer review websites by people identifying themselves as CenturyLink customers, and accuses CenturyLink of fraud, unfair competition, and unjust enrichment.

"Ms. Heiser's allegations of what she observed, and what CenturyLink corporate culture encouraged, are consistent with the experiences of hundreds of thousands and potentially millions of consumers who have been defrauded by CenturyLink," the complaint states. "It is estimated that the damages to consumers could range between $600 million and $12 billion, based on CenturyLink's 5.9 million subscribers."

"The fact that a law firm is trying to leverage a wrongful termination suit into a putative class action lawsuit does not change our original position," Mark Molzen, a CenturyLink spokesman, said in a statement, adding that Heiser failed to report her allegations to the company's 24-hour Integrity Line. He said her claims "are completely inconsistent" with company policy and culture and that "we take these allegations seriously and are diligently investigating this matter."

Class actions are common after contentious allegations against large companies. Sunday's lawsuit was brought on behalf of the consumers by the Geragos & Geragos law firm, led by celebrity attorney Mark J. Geragos. Heiser didn't report her concerns to the Federal Communications Commission or other authorities.

The named plaintiffs in the case are Craig McLeod and Steven L. McCauley, both current customers of CenturyLink. During a conversation in early April with a sales agent on CenutryLink's website, McLeod, 65, was offered a faster internet link for an extra $2 a month with a two-year contract, and accepted, according to the complaint. He alleges he incurred considerably higher fees than quoted and was charged for a repair that never was made.

In an interview, McLeod, a semi-retired truck driver, said that in the area of Alabama where he lives, CenturyLink is the only hardwired internet provider available.

"I'm pretty much stuck with CenturyLink," he said. "I am seriously considering moving just because of them. The internet is that important to me."

On Friday, CenturyLink's shares fell the most in six weeks on the news of Heiser's suit, while the shares of merger partner Level 3 also dropped sharply. The merger will put CenturyLink up against powerhouses such as AT&T Inc. in bidding to provide communications services to businesses. CenturyLink, which provides data

services nationwide, including hosting, cloud, and information technology services, booked $816 million in net income on $17.5 billion in sales last year.

Heiser's complaint alleges that Heiser became increasingly concerned about what she observed at CenturyLink after news of Wells Fargo & Co.'s regulatory troubles broke in September. In that case, Wells Fargo employees, to earn incentives and meet sales goals, opened deposit and credit card accounts without customers' consent. Without admitting wrongdoing, Wells Fargo ended up firing more than 5,000 employees and agreeing to pay $185 million in fines, in addition to compensating customers for fees related to the unauthorized accounts.

83.    As a result of this news, the price of CenturyLink's 7.60% Senior Notes dropped to $92.61 on June 19, 2017 from its close of $98.43 on the previous trading day, a $5.82 (or 6%) drop, on heavy trading volume.

84.    As a result of defendants' wrongful acts and omissions, plaintiff and the Class purchased CenturyLink Notes at artificially inflated prices and suffered significant losses and were damaged thereby.

## LOSS CAUSATION AND ECONOMIC LOSS

85.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of CenturyLink securities, including CenturyLink Notes.  As detailed above, when the truth about CenturyLink's misconduct was revealed, the value of the Company's Notes declined precipitously as the prior artificial inflation no longer propped up the Notes' prices. The decline in CenturyLink's Note price were the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the Note's price decline negates any inference that the losses suffered by plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors or Company specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members, was a direct result of defendants' fraudulent scheme to

artificially inflate the prices of the Company's securities and the subsequent significant decline in the value of the Company's Notes when defendants' prior misrepresentations and other fraudulent conduct were revealed.

86. At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of CenturyLink's business, operations and financial condition, as alleged herein. Throughout the Class Period, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the prices of CenturyLink's Notes to be artificially inflated. Plaintiff and other Class members purchased CenturyLink Notes at those artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

87. Plaintiff will rely upon the presumption of reliance established by the fraud-on- the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's Notes traded in an efficient market;

(d)    The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's Notes; and

(e)    Plaintiff and other members of the Class purchased CenturyLink Notes between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

30

88.     At all relevant times, the market for CenturyLink Notes was efficient for the following reasons, among others:

(a)     As a regulated issuer, CenturyLink filed periodic public reports with the SEC; and

(b)     CenturyLink regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## NO SAFE HARBOR

89.     Defendants' false or misleading statements during the Class Period were not forward-looking statements or were not identified as such by defendants, and thus did not fall within any "Safe Harbor."

90.     CenturyLink verbal "Safe Harbor" warnings accompanying its oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

91.     Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of CenturyLink who knew that the forward-looking statement was false. Further, none of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## CLASS ACTION ALLEGATIONS

92.    Plaintiff brings this action on behalf of all persons and entities who purchased or otherwise acquired CenturyLink's 7.60% Senior Notes during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are the defendants and their immediate families, the officers and directors of the Company and their immediate families, their legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest.

93.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by CenturyLink or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Upon information and belief, these Notes are held by hundreds or thousands of individuals located geographically throughout the country. Joinder would be highly impracticable.

94.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the federal laws complained of herein.

95.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

96.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

(c)    whether the prices of CenturyLink Notes during the Class Period were artificially inflated because of defendants' conduct complained of herein; and

(d)    whether the members of the Class have sustained damages and, if so, the proper measure of damages.

97.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

98.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

99.    During the Class Period, defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary

in order to make the statements made, in light of the circumstances under which they were made, not misleading.

100.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of CenturyLink Notes during the Class Period.

101.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CenturyLink Notes. Plaintiff and the Class would not have purchased CenturyLink Notes at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

102.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of CenturyLink Notes during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act Against All Defendants

103.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

104.    During the Class Period, defendants acted as controlling persons of CenturyLink within the meaning of §20(a) of the Exchange Act. By virtue of their positions and their power to

control public statements about CenturyLink, the Individual Defendants had the power and ability to control the actions of CenturyLink and its employees. CenturyLink controlled the Individual Defendants and its other officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding plaintiff and the members of the Class damages and interest;

C.    Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 25, 2017                              Respectfully submitted,

*/s/ William B. Federman*
William B. Federman (WF9124)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone: (405) 234-1560
wbf@federmanlaw.com
-and-
2926 Maple Ave., Suite 200
Dallas, TX  75201

*Counsel for Plaintiff*

## PLAINTIFF'S CERTIFICATION

YVES I. MALKI , as President and Managing Director of INTER-MARKETING GROUP USA, INC. ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.     Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff's transactions in CenturyLink Inc. Bonds (Rate 07.600% Matures 9/15/39) during the Class Period specified in the Complaint are as follows:

| | Buy | Price |
|---|---|---|
| 11/26/13 | $175,000.00 | $90.70 |
| 3/13/14 | $225,000.00 | $95.25 |

5.     During the three years prior to the date of this Certificate, Plaintiff has sought to serve as a representative party for a class in an action filed under the federal securities laws. City of Birmingham Firemen's and Policemen's Supplemental Pension System v. Plains All American Pipeline, L.P., U.S. Dist. Court, S.D. Texas, 4:15-cv-02404. (Motion denied)

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this
23 RD day of OCTOBER 2017.

YVES I. MALKI , President and Managing Director
INTER-MARKETING GROUP USA, INC.